# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### Southern Division

|  |  |  |
|---|---|---|
| STATE CONSTRUCTION CORP., | * | |
| Plaintiff, | * | |
| v. | * | Case No.: PWG-18-00464 |
| SLONE ASSOCIATES, INC. et al., | * | |
| Defendants. | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM OPINION

State Construction Corp. ("State Construction") has brought this federal lawsuit seeking compensation for labor, materials, and services it provided in the course of a protracted construction project on a military facility in Maryland. It accuses Defendants, including the project's prime contractor, of scheming to deny it the protections accorded under the Miller Act, a law that shields certain classes of subcontractors and suppliers on federally funded construction sites from the risk they will not be paid for their work. Defendants argue this Court lacks jurisdiction over the suit and that, even if jurisdiction does exist, the Amended Complaint fails to state a claim upon which relief may be granted.

I agree with Defendants that, under the express terms of State Construction's subcontract, the company is a "third-tier" subcontractor without standing to bring suit under the Miller Act. I find, though, that the Amended Complaint adequately pleads a claim that the prime contractor breached an implied-in-fact contract to pay State Construction for costs associated with delays on the project and that this claim supplies a basis for federal jurisdiction. I also conclude that

1

Defendants are not entitled to a dismissal of State Construction's Miller Act bond claim, nor of its claims for breach of the implied-in-fact contract and unjust enrichment. I also am permitting the fraud claim against the prime contractor to proceed but am ordering State Construction to further amend its complaint to indicate precisely where the alleged misrepresentations were made and whether they were oral or in writing. The fraud claim against the putative first-tier subcontractor will, however, be dismissed.

## FACTUAL BACKGROUND

This case involves five companies, all of which were involved, to varying extents, in a federally funded construction project at Fort Meade, a military installation in Anne Arundel County, Maryland.[1] The differing roles each of these companies played in the project is critical to the resolution of the matter before me, and so, for the reader's sake, I will pause a moment to introduce them.

I start with the defendants. Slone Associates, Inc. ("Slone") was the prime contractor on the project. Am. Compl. ¶ 11, ECF No. 29. U.S. Specialty Insurance Co. ("U.S. Specialty") was the surety that provided the payment bond required under the Miller Act to protect the subcontractor and a limited class of construction companies and labor and material suppliers involved in the project. *Id.* ¶ 12; *see* 40 U.S.C. § 3131(b)(2) (requiring the prime contractor on certain federal construction projects to furnish a payment bond "for the protection of all persons supplying labor and material in carrying out the work provided for in the contract"). C&S Aircraft

---

[1] All facts are taken from the Amended Complaint (ECF No. 29) and are assumed to be true for purposes of ruling on the motion to dismiss. *See Parker v. Reema Consulting Servs., Inc.*, 915 F.3d 297, 300 (4th Cir. 2019). State Construction should take note that I am disregarding the many allegations it failed to include in its Amended Complaint but chose, in any event, to weave into its response in opposition to Defendants' Consolidated Motion to Dismiss, with all its voluminous attachments. To be clear, "a plaintiff may not amend [its] complaint through argument in briefing." *Kelly v. United States*, No. 7:10-CV-172-FL, 2014 WL 4098943, at *6 (E.D.N.C. Aug. 18, 2014).

2

Service, Inc. ("C&S Aircraft"), based in Georgia, was the putative subcontractor (though, as will soon be made clear, the Amended Complaint alleges its only true function was to shield Slone and U.S. Specialty from Miller Act claims like the ones asserted here). *See id.* ¶ 3. Two Rivers Site Development ("Two Rivers") was the putative second-tier subcontractor (or sub-subcontractor). *Id.* ¶ 23. And, at the end of this chain, there is the Plaintiff, State Construction, which at one time identified itself as a third-tier subcontractor but here seeks to reclassify itself as either a second-tier subcontractor or, under an alternative legal theory, a subcontractor. *See id.* ¶ 25.

The Federal Highway Administration, an agency within the U.S. Department of Transportation, awarded the prime contract to Slone on May 9, 2013, for a price of just under $8.1 million. *Id.* ¶ 11. The agreement called for Slone to design and build an "access control point" at the entrance to Fort Meade. *Id.* ¶¶ 10-11. Slone furnished the required Miller Act payment bond on May 13, 2013, with U.S. Specialty serving as surety. *See id.* ¶ 15.

Slone soon entered into a subcontract with C&S Aircraft, under which the latter company would "perform erosion control, clearing/site demolition, earthwork, surveying and layout, and maintenance of traffic work." *Id.* ¶ 16. The contract price was $992,473.29. *See id.* In its Amended Complaint, State Construction asserts it is "unaware of what line of business C&S engages in, although the name suggests 'aircraft services.'" *Id.* ¶ 3. The sole shareholders, it states, "are Charles Adon Clark and his wife, and according to the internet, it has one employee and had $5,000 annual income before entering into the purported Subcontract Agreement with Slone" on July 15, 2015. *Id.* Under these circumstances, it is hardly surprising that State Construction views the bona fides of the Sloane-C&S "subcontract" with considerable skepticism.

C&S Aircraft and Two Rivers entered into a sub-subcontract agreement one week later, on July 21, 2015. *Id.* ¶ 23. This agreement delegated to Two Rivers the entirety of C&S Aircraft's

performance obligations under the July 15, 2015 subcontract, further strengthening State Construction's suspicions. *See id.*

As the summer progressed, Slone and Two Rivers forged ahead with negotiations on an agreement with State Construction (the plaintiff in this case) for "storm drainage, water and sanitary sewer utility work." *Id.* ¶ 18. C&S Aircraft did not participate in the negotiations. *Id.* The talks culminated on September 24, 2015, when State Construction and Two Rivers entered into a written agreement. *Id.* ¶ 24. The deal, worth $670,000, called for State Construction to install the underground water, storm, and sewer utilities for the project.[2] *See id.*; State-Two Rivers Agreement 12, ECF No. 34-7.

The September 24, 2015 contract was later supplemented by a "Joint Check Agreement," which authorized Slone to pay C&S Aircraft, Two Rivers, and State Construction "by check made jointly" to those three companies.[3] State-Two Rivers Agreement 17; *see* Am. Compl. ¶ 25. This agreement, signed by representatives of all four parties (including C&S Aircraft), listed Slone as the project's "general contractor," C&S Aircraft as the "first tier subcontractor," Two Rivers as the "second tier subcontractor," and State Construction as the "third tier subcontractor." State-Two Rivers Agreement 17; *see* Am. Compl. ¶ 25.

State Construction's responsibilities under the September 24, 2015 contract fell outside of the scope of work that Slone had outlined in its July 2015 subcontract with C&S Aircraft. That

---

[2] A December 2015 change order expanded the scope of work to include "miscellaneous curb and gutter work," increasing the agreement's value to $692,440.76. Am. Compl. ¶ 24.

[3] State Construction did not attach as exhibits any of the various contracts in this case along with its Amended Complaint. Nevertheless, I refer the written agreements here, without having to treat Defendants' motion as a motion for summary judgment, because they are integral to the Amended Complaint, State Construction explicitly relied on them, and their authenticity is unchallenged. *See Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 618 (4th Cir. 1999); *Tinsley v. OneWest Bank, FSB*, 4 F. Supp. 3d 805, 819 (S.D.W.V. 2014).

changed, though, on November 2, 2015, when Slone issued a change order awarding C&S Aircraft an additional $728,079.25 "to perform the underground storm drainage, water, and sanitary sewer work for the Project, the same scope of underground utility work to be performed by State [Construction]." Am. Compl. ¶ 17. That same month, C&S Aircraft issued an "identical" change order adding these duties to Two Rivers's scope of work. *Id.* ¶ 18.

A similar sequence of events soon followed, when another change order expanded State Construction's scope of work to include "some miscellaneous curb and gutter work." *Id.* ¶ 24. The change order, dated December 2, 2015, entitled State Construction to $22,000 for this work. *Id.* One month later, Slone issued a change order inserting this same curb and gutter work, among other "miscellaneous paving work," into its subcontract with C&S Aircraft for the added sum of $33,808.34. *Id.* ¶ 19.

As the work proceeded, State Construction personnel never saw anyone from C&S Aircraft on the jobsite. *See id.* ¶ 21. No one from C&S Aircraft ever attended any project meetings. *Id.* And daily reports prepared by Slone or Two Rivers made no mention of C&S Aircraft workers. *Id.* The company's "only known activity," according to the Amended Complaint, "was to sign checks written by Slone [in return] for a nominal fee." *Id.*

State Construction began to experience delays on site as early as the fall and winter of 2015. *See id.* ¶ 28. Though the company had expected to complete its work by April 2016, poor coordination and other failures it attributes to Slone and Two Rivers left it unable to complete more than 20 percent of its work by that time. *See id.* ¶ 30. To ensure that State Construction would "keep its major equipment and manpower on site," Slone Vice President William Slone and two State Construction executives "entered into an agreement . . . on or about April 1, 2016, for Slone to be directly responsible for the additional costs stemming from the delays and impacts in

performing and completing the remaining eighty percent of the underground utility work." *Id.* ¶ 32. The Amended Complaint characterizes this agreement as an "implied-in-fact agreement," saying it was "based upon conversations and conduct." *Id.* ¶¶ 32-33.

With this agreement in place, Slone "resumed" making interim progress payments for State Construction's work during the spring and summer of 2016. *Id.* ¶ 33. State Construction kept its excavation equipment and personnel on site, but the progress payments ceased. *See id.* At some point (the Amended Complaint is unclear on when), State Construction President Joaquim Mendez reached out to Slone VP William Slone to seek overdue payments. *See id.* ¶ 39. William Slone told him to seek payment from Two Rivers. *See id.* Subsequent communication with Two Rivers revealed that Slone had withheld progress payments from that company as well. *See id.*

State Construction ceased working on the site on May 24, 2017. *Id.* ¶ 38. The company ended up taking in $354,954.94 for its work but estimates that because of the "substantial cost overruns" it incurred, it is entitled to an additional $550,000 under the implied-in-fact agreement with Slone. *Id.* ¶¶ 35, 37.

Under the Miller Act, a company with a "direct contractual relationship with a subcontractor but no contractual relationship, express or implied, with the contractor furnishing the payment bond" must, before bringing suit on the payment bond, give "written notice to the contractor within 90 days from the date on which the [company] performed the last of the labor" for which the claim is made. 40 U.S.C. § 3133(b)(2). State Construction did not send any such written notice to Slone. However, on August 22, 2017, its project manager, Ernest J. Clemens, sent a letter to Two Rivers President Stephen Allen in which he asserted that State Construction had "incurred significant increased costs" because of the project's various delays. August 22, 2017 Letter, ECF No. 34-24; *see* Am. Compl. ¶¶ 40-41. The letter concluded:

> It is imperative that you give notice . . . pursuant to the Miller Act to the Prime Contractor Slone Associates Inc. . . . and its Miller Act Surety, U.S. Specialty Insurance Company, for these unpaid costs of State Construction Corp. for the utility work as well as any costs incurred by your firm that remains unpaid in order to maintain the protection of the Miller Act bond, by August 22, 2017 close of business.

August 22, 2017 Letter, ECF No. 34-24; *see* Am. Compl. ¶ 40. Two Rivers forwarded the letter to Slone that same day. *See* Am. Compl. ¶¶ 41, 43.

The government terminated Slone's prime contract on November 24, 2017, for default. *See id.* ¶ 13. One week later, Two Rivers sent State Construction an email, to which was attached a letter from Slone. *See id.* ¶ 44. The letter, which featured Two Rivers's letterhead, asserted that State Construction could not bring a Miller Act claim against Slone because State Construction was a mere third-tier subcontractor. *See id.*

State Construction brought this lawsuit on February 14, 2018, naming Slone, C&S Aircraft, Two Rivers, and U.S. Specialty as defendants. *See* Compl., ECF No. 1. Its Amended Complaint, filed on June 19, 2018, asserted five claims in all: (1) breach of contract against Two Rivers (Count I); (2) breach of implied-in-fact contract against Slone (Count II); (3) quantum meruit against Slone and Two Rivers (Count III); (4) Miller Act bond claim against U.S. Specialty (Count IV); and (5) fraud against Slone, C&S Aircraft, and Two Rivers (Count V).

Two Rivers filed an answer to the Amended Complaint and is not presently seeking dismissal of any of the claims against it (Counts I, III, and V). ECF No. 31. However, the other three defendants (to whom I will refer, collectively, as "Defendants," for the sake of simplicity) have filed a Consolidated Motion to Dismiss the Amended Complaint. Mot. to Dismiss, ECF No. 32. The motion first seeks a dismissal under Rule 12(b)(1) of the Federal Rules of Civil Procedure, arguing that this Court lacks subject matter jurisdiction over the Amended Complaint. *See id.* at

6-12. It next seeks to dismiss Counts II through V under Rule 12(b)(6) for failure to state a claim upon which relief may be granted. *See id.* at 13-28.

The parties have fully briefed their arguments. *See* ECF Nos. 32-37. No hearing is necessary. *See* Loc. R. 105.6.

## STANDARD OF REVIEW

Defendants seek a dismissal under either Rule 12(b)(1) or 12(b)(6) of the Federal Rules of Civil Procedure. A 12(b)(1) motion challenges the district court's subject matter jurisdiction, asserting, in effect, that the plaintiff lacks any "right to be in the district court at all." *Holloway v. Pagan River Dockside Seafood, Inc.*, 669 F.3d 448, 452 (4th Cir. 2012). The burden of establishing the court's subject matter jurisdiction rests with the plaintiff. *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999).

The Fourth Circuit has recognized that a defendant may challenge the district court's subject matter jurisdiction in either of two ways. *See Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009). He may, for one, mount a facial challenge, in which he "contend[s] 'that a complaint simply fails to allege facts upon which subject matter jurisdiction can be based.'" *Id.* (quoting *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982)). In that situation, the court takes the complaint's allegations as true and denies the motion "if the complaint alleges sufficient facts to invoke subject matter jurisdiction." *Id.* Alternatively, the defendant may mount a factual challenge, asserting that the complaint's jurisdictional allegations are not true. *See id.* In that case, the court "'may go beyond the allegations of the complaint and in an evidentiary hearing determine if there are facts to support the jurisdictional allegations,' without converting the motion to a summary judgment proceeding." *Id.* (quoting *Adams*, 697 F.2d at 1219).

Here, the Consolidated Motion to Dismiss asks me to "assume that the factual allegations in the complaint are true" for purposes of ruling on the jurisdictional issues under Rule 12(b)(1). Mot. to Dismiss 4. It further explains that the Court must "grant a motion to dismiss for lack of subject matter jurisdiction where the plaintiff *fails to plead facts* that meet 'the plausibility standard of Rule 12(b)(6) and *Iqbal/Twombly*.'" *Id.* (emphasis added). I infer from this language that Defendants' invocation of Rule 12(b)(1) presents a facial challenge, and so in ruling on their motion I will assume all allegations in the Amended Complaint are true.

A 12(b)(6) motion, in contrast with a motion to dismiss for lack of jurisdiction, "tests the sufficiency" of the plaintiff's complaint. *Vance v. CHF Int'l*, 914 F. Supp. 2d 669, 677 (D. Md. 2012). Under Rule 8(a)(2), the complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Beyond that, the Supreme Court has held that claims for relief must be "plausible," specifying that "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678.

## DISCUSSION

The Consolidated Motion to Dismiss begins by questioning this Court's power to hear this case. This is a threshold question, and I will start my analysis there. Because, in the end, I conclude that State Construction has pleaded sufficient facts to survive a Rule 12(b)(1) motion, I will proceed to review Defendants' arguments for a dismissal under Rule 12(b)(6).

**A.**

"Federal courts are courts of limited jurisdiction. They possess only that power authorized by the Constitution and statute." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994); *see Hagans v. Lavine*, 415 U.S. 528, 538 (1974). Here, State Construction has sought to invoke this Court's jurisdiction under 28 U.S.C. § 1331 and the Miller Act, 40 U.S.C. § 3133(b). The latter statute authorizes suits by two classes of claimants: "(1) those materialmen, laborers and subcontractors who deal directly with the prime contractor and (2) those materialmen, laborers and sub-contractors who, lacking [an] express or implied contractual relationship with the prime contractor, have [a] direct contractual relationship with a subcontractor and who give the statutory notice of their claims to the prime contractor." *Clifford F. MacEvoy Co. v. United States ex rel. Calvin Tomkins Co.*, 322 U.S. 102, 107-08 (1944); *see* 40 U.S.C. § 3133(b)(1)-(2). As I will discuss in more detail below, the statute does not allow would-be claimants with "more remote relationships" to recover on the payment bond. *Clifford F. MacEvoy*, 332 U.S. at 108.

State Construction does not deny that its status as a "third-tier subcontractor" (as the company was expressly labeled in the Joint Check Agreement) would ordinarily preclude it from bringing claims under the Miller Act. It nevertheless asks this Court to disregard that label for either of two reasons. First, it urges the Court to treat the company as a second-tier subcontractor and allow its recovery under § 3133(b)(2) on the ground that the putative subcontract between Slone and C&S Aircraft was a "sham" – that is, a ploy to shield Slone from Miller Act claims like the ones asserted here. Alternatively, State Construction asserts the Court may treat it as a first-tier subcontractor on the theory that it formed an implied-in-fact contract with Slone in April 2016.

Defendants challenge both of these contentions. They further argue that, should I accept State Construction's contention that it ought to be treated as a second-tier contractor, it would

nevertheless be statutorily barred from bringing a Miller Act claim because it failed to provide Slone with adequate notice under § 3133(b)(2).

**1.**

The first and most contentious question the parties have raised at this stage of the proceedings is whether it is possible to elevate State Construction to the ranks of a second-tier contractor, which would qualify the company to bring suit under § 3133(b)(2).[4]

The Joint Check Agreement explicitly identifies State Construction as a "third tier subcontractor." *See* Am. Compl. ¶ 25; State-Two Rivers Agreement 17. Were I to credit this designation, there would be no question that the company would have no right to recover under Slone's Miller Act payment bond. *See J. W. Bateson Co. v. United States ex rel. Bd. of Trustees of Nat'l Automatic Sprinkler Indus. Pension Fund*, 434 U.S. 586, 591 (1978).

To overcome this barrier, State Construction would have me excise the nominal subcontractor, C&S Aircraft, from the chain of contractual relationships involved in the Fort Meade construction project. Its argument, in short, is that the Slone-C&S Aircraft subcontract served no purpose other than to attenuate Slone's connection to other companies working on the site and, in so doing, bar at least some of those companies from recovering on the payment bond.

---

[4] This provision states in part:

> A person having a direct contractual relationship with a subcontractor but no contractual relationship, express or implied, with the contractor furnishing the payment bond may bring a civil action on the payment bond on giving written notice to the contractor within 90 days from the date on which the person did or performed the last of the labor or furnished or supplied the last of the material for which the claim is made.

40 U.S.C. § 3133(b)(2).

State Construction's argument leans heavily on two out-of-circuit Miller Act cases, each more than half a century old. It first cites *Glens Falls Insurance Co. v. Newton Lumber & Mfg. Co.*, in which the Tenth Circuit concluded the district court did not clearly err in finding, after a bench trial, that a putative subcontract was a "sham." 388 F.2d 66, 69-70 (10th Cir. 1967). In support of its finding, the district court had noted that the prime contractor and putative subcontractor were close friends and were married to sisters; that the putative subcontractor (a man named Campbell) had recently worked full-time as a dentist and did not appear to have much construction experience; that he was never seen on the construction site; and that the prime contractor, rather than Campbell, had been the one to conduct negotiations and prepare the written agreement with the putative sub-subcontractor. *See id.* at 68-69. The district court found that Campbell was "in substance" the prime contractor's "agent," rather than a subcontractor, and the Tenth Circuit agreed, stating that the trial court had "properly regarded substance, rather than form," in assessing each company's place in the hierarchy of subcontractors. *Id.* at 69.

The response in opposition to the Consolidated Motion to Dismiss cites *Continental Casualty Co. v. United States ex rel. Conroe Creosoting Co.*, 308 F.2d 846 (5th Cir. 1962), for the same principle. There, a jury found that the general contractor's use of one of its own subsidiaries as a nominal subcontractor was a "sham." 308 F.2d at 848. On appeal, the Fifth Circuit rejected the surety's argument that the district court had improperly permitted the jury to "pierce" the subsidiary's corporate structure. *Id.* "So far as the record in this case is concerned," the Fifth Circuit wrote, "we have nothing more than a shadow of [the subsidiary], and the verdict of the jury was not based upon the validity of the corporate structure of [the subsidiary], but rather was based upon the fact [of] whether the corporation was used as a sham, a subterfuge and a tool by [the general contractor]." *Id.*

State Construction argues that these cases, and a third case of more questionable relevance,[5] "establish that this Court has Miller Act jurisdiction over Plaintiff's Miller Act bond claim." Opp'n 20, ECF No. 33. But its memorandum fails to acknowledge (as a candid discussion of the applicable law should) that the case law has evolved since *Glens Falls* and *Continental Casualty* were issued. The newer cases, beginning with the Supreme Court's decision in *J. W. Bateson Co. v. U.S. ex rel. Board of Trustees of National Automatic Sprinkler Industry Pension Fund*, 434 U.S. 586 (1978), demonstrate a preference for a more formalistic approach than the Fifth and Tenth Circuits had previously taken.

The question in *J. W. Bateson* was whether a company – technically a second-tier subcontractor – might be treated as a first-tier subcontractor in a Miller Act suit because of its substantial dealings with the prime contractor on the jobsite. The D.C. Circuit had answered this question in the affirmative, employing a "functional test" that assessed the "substantiality and importance" of the second-tier subcontractor's relationship with the prime contractor. 434 U.S. at 588. The Supreme Court, though, rejected the functional test and reversed, concluding that the word "subcontractor," as it appears in the Miller Act, "must be limited in meaning to one who contracts with a prime contractor." *Id.* at 593-94.

---

[5] Plaintiff cites this case, *United States ex rel. M. A. Bruder & Sons, Inc. v. Aetna Cas. & Sur. Co.*, 480 F. Supp. 659 (D.D.C. 1979), for the proposition that a "third-tier subcontractor may recover under [the Miller] Act where [the] second-tier subcontractor was a mere conduit for billing purposes." Opp'n 20. I question this characterization. In *Bruder*, the plaintiff presented itself as a second-tier subcontractor. *See* 480 F. Supp. at 661. The defendants sought to reclassify the plaintiff as a third-tier subcontractor based on evidence that the first-tier subcontractor, Wm. S. Alt & Son ("Alt"), had asked it to send its bills to another company, Kenneth Sales Corp. ("Sales"), and that the plaintiff had complied with the request. *See id.* at 660. The district court did not credit their argument, finding as matter of law that Sales "was not a subcontractor," but rather, "[a]t most, it was a mere conduit set up by Alt for some internal billing purpose." *Id.* at 662.

The Fourth Circuit similarly elevated form over substance in *United States ex rel. Global Building Supply, Inc. v. WNH Ltd. Partnership*, 995 F.2d 515 (4th Cir. 1993). There, two suppliers who would otherwise lack standing to bring a Miller Act claim urged the court to treat the prime contractor (a limited partnership called "WNH") and subcontractor (a corporation) as a single entity. 995 F.2d at 518. They argued a "functional" approach would be more appropriate than a formal one under the circumstances because the two men who owed the latter corporation were, not incidentally, limited partners in WNH. *Id.* at 517.

The Fourth Circuit disagreed, holding that reclassifying a nominal subcontractor as a prime contractor, as the suppliers had urged the court to do, would be "appropriate only where ordinary principles of corporate law permit the courts to disregard corporate forms." *Id.* at 519. The court rooted its holding in *J. W. Bateson*, which it framed as an "admonition . . . to heed the Miller Act's terms and avoid imposing 'wholesale liability' on payment bonds." *Id.* (citing *J. W. Bateson*, 434 U.S. at 594). The Fourth Circuit's opinion emphasized that the Miller Act's risk-allocation scheme depends, to an extent, on the certainty that comes with clear, bright-line rules. *Id.* For this reason, it stated, courts must enforce the Act's terms, which limit recovery "to those having direct contractual relationships with subcontractors who in turn have direct contractual relationships with" the prime contractor. *Id.*

The *Global Building Supply* court acknowledged that its "formal" approach might encourage general contractors to "weave elaborate webs of do-nothing subcontractors between themselves and the ranks of legitimate subcontractors in order to deprive them of Miller Act coverage." *Id.* at 520. Nevertheless, it stated, this possibility

> must be balanced against the uncertain allocation of risks that might result from a more open-ended inquiry and the ability of professional parties to provide contractually their own insurance against defaults. Parties contracting with others who can either

14

> produce a contract with the government or produce a contract with
> a subcontractor who can in turn produce a government contract will
> have the assurance of a Miller Act remedy. All other parties will
> have the assurance of its lack, and the incentive to order their affairs
> accordingly.

*Id.*

Notably, in their efforts to convince the appellate court to adopt a "functional" approach to Miller Act standing, the suppliers in *Global Building Supply* had themselves relied on *Glens Falls* and *Continental Casualty*, as State Construction does here. 995 F.2d at 519. The Fourth Circuit, rejecting this entreaty, characterized those cases as "aging" and noted that "each understandably fails to address the Supreme Court's" holding in *J. W. Bateson*. *Id.* Other federal courts of appeals have likewise questioned (without deciding) whether *Glens Falls* and *Continental Casualty* remain good law. *See United States ex rel. O.L.S., Inc. v. Southwind Constr. Servs., LLC*, 510 F. App'x 688, 691-92 (10th Cir. 2013); *United States ex rel. K & M Corp. v. A & M Gregos, Inc.*, 607 F.2d 44, 47-48 (3d Cir. 1979).

I take the view that State Construction's "straw man" theory is not viable in light of *J. W. Bateson* and *Global Building Supply*. These cases counsel in favor of a bright-line rule, one that would label each participant in a construction project according to its contractually stated place in the line of contractual relationships, rather than the functional nature of its scope of work on the jobsite. *J. W. Bateson* is especially clear on this point, stating that the term "subcontractor," as it appears in the Miller Act, "must be limited in meaning to one who contracts with a prime contractor." 434 U.S. at 594; *see United States ex rel. Gibson Equip. Co. v. Leon Perlin Co.*, 680 F.2d 340, 341 (4th Cir. 1982). State Construction's theory is incompatible with this statement of law, as it would elevate Two Rivers to the status of "subcontractor" despite the absence of an agreement between that company and Slone, the prime contractor.

Even if I were to regard *Glens Falls* and *Continental Casualty* as good law, I would hesitate to view these cases as applicable here. In *Glens Falls*, each of the two plaintiffs seeking to recover under the Miller Act had been told that the company with which they were negotiating, Whiteside Construction, was the "framing subcontractor"; the Tenth Circuit's opinion suggests that neither plaintiff had reason to know that Whiteside did not itself have an agreement with the prime contractor. *See* 388 F.2d at 69. State Construction, by contrast, was under no illusions. The Amended Complaint makes clear it knew that Two Rivers's contract was not with Slone, but with C&S Aircraft. *See* Am. Compl. ¶¶ 27, 36. Plainly, State Construction executed its agreement with Two Rivers, and the accompanying Joint Check Agreement, without any reason to expect it would have recovery rights under the Miller Act. This much is evidenced by the fact that, when State Construction ultimately did attempt to preserve the possibility of a Miller Act payment bond recovery, it did not deliver the statutory notification directly to Slone, as a second-tier subcontractor would be entitled to do; rather, it pressed Two Rivers – the nominal second-tier subcontractor – to deliver the required notice. *See id.* ¶ 40.

State Construction asserts that, had it "known the truth that C&S was a 'sham' subcontractor, under the control of Slone, then State never would have entered into the Subcontract with Two Rivers (including the Joint Check Agreement), and instead would have insisted on entering into a direct subcontract with Slone." *Id.* ¶ 27. Maybe so. But what is implicit in this argument is that State Construction entered into an agreement in which Miller Act protection was not a part of the bargain. This expectation was not incidental to the parties' bargaining position. Surely, a company that knows its agreement carries certain risks may bargain for a higher contract price as compensation for that risk. Here, in urging me to treat State Construction as a second-tier

subcontractor, the company is urging me to unwind its agreement with Two Rivers and give it the benefit of a bargain it never struck.

I decline to reform State Construction's agreement with Two Rivers, just as I decline to disregard C&S Aircraft's agreement with Slone. Accordingly, I reject State Construction's argument that it may recover under the Miller Act as a second-tier subcontractor.[6]

## 2.

Had State Construction not amended its Complaint, my analysis would in all likelihood have ended there. The Amended Complaint, though, asserts an alternative basis for permitting the company to proceed on its Miller Act claim. Under this theory, State Construction would be entitled to bring a civil action as a subcontractor under 40 U.S.C. § 3133(b)(1) because it entered into a separate, implied-in-fact agreement with the prime contractor, Slone, sometime around April 1, 2016. *See* Am. Compl. ¶¶ 32, 61-66.

Preliminarily, I observe that an implied-in-fact contract is, for all intents and purposes, an "actual contract."[7] *Alts. Unltd., Inc. v. New Balt. City Bd. of Sch. Comm'rs*, 843 A.2d 252, 295 (Md. Ct. Spec. App. 2004). "The only difference between an implied contract and an express contract is not the existence of the contract itself but only the modality of its proof." *Id.* What distinguishes the former is simply that the agreement's existence is evidenced by the parties' "conduct, rather than an explicit set of words." *Id.* at 289 (quoting *Mogavero v. Silverstein*, 790

---

[6] My ruling on this issue makes it unnecessary to address Defendants' alternative argument that even if State Construction were deemed a second-tier subcontractor, it failed to provide proper notice of its claim under 40 U.S.C. § 3133(b)(2).

[7] Defendants' Consolidated Motion to Dismiss assumes that Maryland law governs this issue. *See* Mot. to Dismiss 21. State Construction's response in opposition is less clear on this point, citing cases from a range of federal district courts. *See* Opp'n 24-25. In the absence of any arguments to the contrary, I assume that Maryland law is applicable.

A.2d 43, 52 (Md. Ct. Spec. App. 2002)); *see Cty. Comm'rs of Caroline Cty. v. J. Roland Dashiell & Sons, Inc.*, 747 A.2d 600, 606 & n.6 (Md. 2000).

The Miller Act, consistent with this understanding, does not distinguish between express agreements and those that are implied in fact. *See* 40 U.S.C. § 3133(b)(2) (outlining the legal rights of entities "having a direct contractual relationship with a subcontractor but no contractual relationship, *express or implied*, with the contractor furnishing the payment bond" (emphasis added)); *Fidelity & Deposit Co. of Md. v. Harris*, 360 F.2d 402, 408 (9th Cir. 1966) ("Recovery under the Miller Act is limited to those who have a direct contractual relationship, *express or implied*, with the prime contractor or a direct contractual relationship, express or implied, with a subcontractor of the prime contractor." (emphasis added)).

Defendants' Consolidated Motion to Dismiss the Amended Complaint argues State Construction's implied-in-fact contract claim fails under Rule 12(b)(1) for two reasons. First, it contends, the Amended Complaint does not plead "sufficient details to explain how the implied-in-fact contract came to be." Mot. to Dismiss 12. Second, it says, the pleading fails to assert that either State Construction or Slone "received any consideration" under the agreement, as would be required to establish the formation of an implied-in-fact contract. *See id.* These contentions speak to the merits of State Construction's claim, which I will address in due course. Focusing on the narrow question before me – i.e., whether the Court has subject matter jurisdiction – I conclude that it does, and that Defendants' arguments do not undermine this conclusion. *See Holloway v. Pagan River Dockside Seafood, Inc.*, 669 F.3d 448, 452 (4th Cir. 2012) ("Deficiencies in the statement of a federal cause of action should normally be addressed by a motion under rules challenging the sufficiency of the complaint or the evidence pleaded to support the complaint, such as authorized by Rules 12(b)(6), 12(c), or 56.").

In bringing a Miller Act suit, State Construction has invoked this Court's "federal question" jurisdiction under 28 U.S.C. § 1331. In *Arbaugh v. Y&H Corp.*, the Supreme Court clarified that a plaintiff "properly invokes § 1331 jurisdiction when she pleads a colorable claim 'arising under' the Constitution or laws of the United States." 546 U.S. 500, 513 (2006) (citing *Bell v. Hood*, 327 U.S. 678, 681-85 (1946)). The Court explained that a claim is "not colorable," and therefore subject to dismissal under Rule 12(b)(1), "if it is 'immaterial and made solely for the purpose of obtaining jurisdiction' or is 'wholly insubstantial and frivolous.'" *Id.* at 513 n.10 (quoting *Bell*, 327 U.S. at 682-83); *cf. Engage Learning, Inc. v. Salazar*, 660 F.3d 1346, 1353 (Fed. Cir. 2011) (holding that jurisdiction under the Contract Disputes Act of 1978, as under the Tucker Act, "requires no more than a non-frivolous *allegation* of a contract with the government," be it express or implied).

Here, the Amended Complaint alleges that a series of challenges on the jobsite prevented State Construction from completing more than 20 percent of its work within the six-month timeframe its agreement with Two Rivers had contemplated. *See* Am. Compl. ¶ 30. It asserts that government officials at the weekly progress meetings attributed the delays to Slone. *See id.* ¶ 31. Consequently, it states, State Construction's president and manager of operations "entered into an agreement" with Slone's vice president "on or about April 1, 2016, for Slone to be directly responsible for the additional costs stemming from the delays and impacts in performing and completing the remaining eighty percent of the underground utility work, in order to have State maintain its equipment and labor force on standby." *Id.* ¶ 32. It asserts that the agreement was "based upon conversations and conduct" and that it prompted Slone to resume making interim progress payments for work State Construction performed during the spring and summer of 2016. *Id.*

I do not disagree with Defendants that some of these allegations appear thin. Among them, the assertion that an implied-in-fact contract was inferable from "conversations and conduct" would seem to qualify as the kind of conclusory statement that, without more, would not propel a complaint past the threat of dismissal under Rule 12(b)(6). *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). But, as the Fourth Circuit has noted, "the subject matter jurisdiction of a federal court," as challenged under Rule 12(b)(1), "is not generally resolved by concluding that the plaintiff has failed to allege an element of a federal cause of action or that the plaintiff might not be able to prove an element of a federal cause of action." *Holloway*, 669 F.3d at 452. As pleaded, State Construction's implied-in-fact contract claim is not "so wholly insubstantial and frivolous that an invocation of federal jurisdiction should not be recognized." *Id.* at 453. I conclude, therefore, that the allegations in the Amended Complaint are adequate to empower this Court to assume jurisdiction over this case.[8]

## B.

Having completed my assessment of Defendants' jurisdictional arguments, I will now consider whether Counts II, III, and V in the Amended Complaint state claims upon which relief can be granted.

## 1.

I start with Count II, which seeks to hold Slone liable for breach of the above-described implied-in-fact contract. I have already explained that the allegations pertaining to this count were sufficiently well developed to overcome a challenge under Rule 12(b)(1). The question now is

---

[8] And, because Defendants seek to dismiss the Miller Act bond claim (Count IV) against U.S. Specialty "for the same reasons that this Court does not have jurisdiction" over the case, Count IV will not be dismissed.

whether these same allegations, taken as true, plausibly permit a reasonable inference of Defendants' liability. *Iqbal*, 556 U.S. at 678.

Implied-in-fact contracts, as I have noted, are no less binding or enforceable than express contracts. *See Alts. Unltd.*, 843 A.2d at 295. And, as is the case with express contracts, the formation of an implied-in-fact contract "requires mutual assent (offer and acceptance), an agreement definite in its terms, and sufficient consideration." *CTI/DC, Inc. v. Selective Ins. Co. of Am.*, 392 F.3d 114, 123 (4th Cir. 2004) (citing *Peer v. First Fed. Sav. & Loan Ass'n of Cumberland*, 331 A.2d 299, 301 (Md. 1975)).

Defendants argue the Amended Complaint fails to establish either mutual assent or consideration. As to the former, they say the Amended Complaint "relies entirely on the unsupported conclusion that the parties entered into an agreement 'based upon conversations and conduct.'" Mot. to Dismiss 23. This statement, they say, is "purely conclusory" and is unaccompanied by "even one example of a conversation between [State Construction]'s representatives and those of Slone on which the alleged implied-in-fact contract rests." *Id.*

I agree that the phrase "based upon conversations and conduct" is conclusory and, as a standalone statement, is "not entitled to the assumption of truth." *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (quoting *Iqbal*, 556 U.S. at 679). But the phrase does not stand alone. While the Amended Complaint could certainly benefit from more detail, it is not nearly as devoid of factual allegations as Defendants claim.

In Maryland, courts infer mutuality of assent to an implied-in-fact contract from the parties' actions or conduct and from "circumstances which, according to common understanding, show a mutual intention on the part of the parties to contract with each other." *Mogavero*, 790 A.2d at 53 (quoting *Johnson v. Nasi*, 309 P.2d 380, 382-83 (Wash. 1957)). Here, the Amended Complaint

alleges that the implied agreement arose on April 1, 2016, as executives for State Construction and Slone were discussing the delays State Construction claimed to be experiencing on the site. *See* Am. Compl. ¶ 32. The Amended Complaint places these conversations in context, explaining that State Construction's work should have been completed that month, but that "because of the lack of scheduling, the lack of coordination of public utility relocations, delays in grading work, and the failure of Slone and/or Two Rivers to survey the existing grades properly in State's work areas, State was only able to complete less than twenty percent of its Project work within the original six-month duration time." *Id.* ¶ 30. It further notes that this topic had been raised during the weekly progress meetings on site, and that at one of these meetings the Government's representatives faulted Slone for the delays. *See id.* ¶ 31.

The Amended Complaint identifies the specific individuals who "entered into" the implied-in-fact agreement: State Construction's president, Joaquim Mendez; its manager of operations, Ernest Clemens; and Slone Vice President William Slone. *Id.* ¶ 32. It then specifies exactly what the agreement called for – namely, "for Slone to be directly responsible for the additional costs stemming from the delays and impacts in performing and completing the remaining eighty percent of the underground utility work, in order to have State maintain its equipment and labor force on standby." *Id.* Finally, it alleges that the agreement had an immediate impact on the companies' conduct. State Construction, "[b]ased upon the implied-in-fact agreement, . . . maintained its on-site excavation equipment and personnel through the end of May 2017." *Id.* ¶ 34. And while the Amended Complaint does not assert that Slone paid State Construction for costs associated with the alleged delays, it does state that, "[b]ased upon the above implied-in-fact agreement, interim progress payments were resumed by Slone for work performed by State during the spring and summer of 2016." *Id.* ¶ 33.

Defendants rightly note that some of the allegations woven into this section of the Amended Complaint do not, in and of themselves, evidence the existence of an implied-in-fact agreement. In particular, the allegation that C&S Aircraft and Two Rivers endorsed the checks by which Slone made the interim progress payments would seem irrelevant, as this is exactly what the Joint Check Agreement had called for them to do. *See* Am. Compl. ¶ 33; State-Two Rivers Agreement 17-18. But State Construction is not alleging that the implied-in-fact agreement took the place of preexisting agreements. Its claim, rather, is that Slone agreed to incur *additional* obligations to prevent State Construction from withdrawing its personnel and equipment from the work site. To that end, the Amended Complaint alleges that specific named executives were engaged in a dialogue about the ongoing delays on the project; that an ostensibly neutral third party (the Government) had effectively blamed Slone for those delays; that Slone had reason to fear State Construction might pull its equipment and workers off the site; that, following the discussions, State Construction chose not to withdraw from the site; and that Slone promptly resumed making payments. At this stage of the proceedings, where I must take the Amended Complaint's factual allegations as true and view them in the light most favorable to the plaintiff, *see Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 253 (4th Cir. 2009), that is enough.

I likewise reject Defendants' argument that the implied-in-fact agreement, as alleged, was unsupported by consideration.

"Under Maryland law, an enforceable contract must be supported by consideration. A promise becomes consideration for another promise if it creates a binding obligation. A promise to perform a pre-existing legal obligation does not constitute consideration." *Hoppe v. Coll. Of*

*Notre Dame of Md.*, 835 F. Supp. 2d 26, 34-35 (D. Md. 2011) (citations omitted); *see Russ v. Barnes*, 329 A.2d 767, 770 (MD. Ct. Spec. App. 1974).

Defendants contend that the alleged implied-in-fact agreement "appears to merely duplicate State's existing obligations to Two Rivers." Mot. to Dismiss 25. But, again, at this stage of the proceedings I must take the Amended Complaint at face value. There, in its description of State Construction's subcontract with Two Rivers, it states only that this agreement required State Construction "to install the underground utility (water, storm, and sewer) for the Project," and that this work was to be "substantially complete in approximately a six (6) month duration or by the end of March 2016." Am. Compl. ¶ 24. The implied-in-fact agreement, as alleged, demanded something different – namely, for State Construction to "keep its major equipment and manpower on site" beyond the previously contemplated six-month timeframe. *Id.* ¶ 32. While Defendants may yet seek to establish, on summary judgment, that the preexisting subcontract already obligated State Construction to do just this, that is a matter for another time. For now, I am obligated to conclude that the allegation of new consideration – and, by extension, Count II of the Amended Complaint – is sufficiently well pleaded so as to withstand Defendants' Rule 12(b)(6) motion.

## 2.

Defendants next challenge Count III, which seeks recovery from Slone and Two Rivers on the basis of quantum merit. Maryland courts recognize two forms of quantum meruit claims: one based on an implied-in-fact contract, and one based on a quasi-contract, also known as an implied-in-law contract. *See Mohiuddin v. Doctors Billing & Mgmt. Sols., Inc.*, 9 A.3d 859, 864 (Md. Ct. Spec. App. 2010). State Construction's response in opposition to the Consolidated Motion to

Dismiss clarifies that the claim asserted in Count III is of the second variety and should be construed as a claim for unjust enrichment.[9] *See* Opp'n 33-34.

In Maryland, an unjust enrichment claim requires a plaintiff to establish that: (1) the defendant conferred a benefit upon the plaintiff; (2) the defendant appreciated or knew of the benefit; and (3) the defendant accepted or retained the benefit "under such circumstances as to make it inequitable for the defendant to retain the benefit without the payment of its value." *Mohiuddin*, 9 A.3d at 865. State Construction's claim is premised on its assertion that Slone and Two Rivers were unjustly enriched in the amount of $550,000, "which is the reasonable value of labor, materials, services and equipment provided for the performance of the utility work on the Project." Am. Compl. ¶ 69.

Defendants' Consolidated Motion to Dismiss emphasizes the need for the alleged enrichment to have been *unjust*. Mot. to Dismiss 27. State Construction, it argues, "has not alleged that it would be inequitable for Slone to retain the 'value of the labor, materials, services and equipment' received from State's 'performance of the utility work on the Project.'" *Id.* (quoting Am. Compl. ¶¶ 67-69). In particular, it says, "while State makes several references to its cost overruns and an unpaid amount of $550,000, it does not assert that it is unfair for State, rather than Slone, to incur those costs." *Id.*

"The third element of an unjust enrichment claim, whether it is inequitable or unjust for the beneficiary to retain the benefit without the payment of its value, is 'a fact-specific balancing

---

[9] As a general matter, Maryland courts do not recognize quasi-contract claims such as quantum meruit or unjust enrichment "when an express contract defining the rights and remedies of the parties exists." *United States ex rel. Tusco, Inc. v. Clark Constr. Grp., LLC*, 235 F. Supp. 3d 745, 755 (D. Md. 2016) (quoting *J. Roland Dashiell*, 747 A.2d at 610). Parties, though, "may plead alternative theories of liability, indeed as many theories as the facts will fit." *Id.* (quoting *Swedish Civil Aviation Admin. v. Project Mgmt. Enters., Inc.*, 190 F. Supp. 2d 785, 792 (D. Md. 2002)).

of the equities.'" *Royal Inv. Grp., LLC v. Wang*, 961 A.2d 665, 685 (Md. Ct. Spec. App. 2008) (quoting *Hill v. Cross Country Settlements, LLC*, 936 A.2d 343 (Md. 2007)). While it would be difficult to distill this concept to an administrable rule, it is at least clear that a theory of unjust enrichment will not lie where the plaintiff, in conferring the benefit, was acting as a "mere volunteer" or "officious payor." *Hill*, 936 A.2d at 355. The Maryland Court of Appeals has explained that a plaintiff

> is not officious when he or she acts under a legal compulsion or duty, acts under a legally cognizable moral duty, acts to protect his or her own property interests, acts at the request of the defendant, or acts pursuant to a reasonable or justifiable mistake as to any of the aforementioned categories.

*Id.* at 357.

A case cited by Defendants, *Royal Investment Group, LLC v. Wang*, 961 A.2d 665 (Md. Ct. Spec. App. 2008), illustrates the principle. There, negotiations for the purchase of real property broke down before closing, but the prospective buyer nevertheless proceeded to enter the property without permission, demolish the house that sat on it, and build a new home. *See* 961 A.2d at 672. The prospective buyer sought restitution from the property owner under the doctrine of unjust enrichment, but the trial court – after a bench trial – denied the claim. *See id.* In a decision affirming the denial, the Court of Special Appeals agreed that the equities "weighed heavily" in the property owner's favor because the prospective buyer "acted with a shocking disregard of [the owner's] property rights, including demolishing [the owner's] house without a permit and constructing a house after receiving [multiple] letters from [the owner's] attorney that explicitly warned [the prospective buyer] that he had no right to enter onto the Property." *Id.* at 685.

The case before me bears no resemblance to *Royal Investment*. Certainly, no one has asserted that State Construction was not authorized to work on the Fort Meade construction site.

Nor is there any indication that Slone or any other defendant sought to stop State Construction from continuing to work there. Rather, State Construction has alleged that it performed its obligations as authorized, and as expected, by both Slone and Two Rivers, and that it was not properly paid for its work. That Defendants profess not to see the unfairness of the situation in which State Construction found itself is not determinative. Under Maryland law, no more than what State Construction pleaded is required to state a claim for relief.

Defendants' discussion of *Bowers v. Bank of America, N.A.*, 905 F. Supp. 2d 697 (D. Md. 2012), does not persuade me otherwise. *See* Mot. to Dismiss 27. The pleading defect in *Bowers* was not the plaintiff's failure to allege that the benefit he conferred on the defendant was unjust – it was his failure to allege there was any benefit at all. The sole basis for the plaintiff's 11-count complaint was an allegation that Bank of America had failed to process his application to participate in a recently launched federal program to help homeowners modify their mortgage terms and avoid foreclosure. *See* 905 F. Supp. 2d at 700. But, as the district court noted, the only benefit he allegedly conferred on the bank was the value of the mortgage payments he was continuing to make under a separate agreement, entirely apart from the application to participate in the federal program. *See id.* at 703.

Here, State Construction has alleged that its authorized work on the construction site conferred a benefit on Slone and Two Rivers. Its quantum meruit claim seeks to recover the value of that benefit. Defendants, I find, are not entitled to dismiss this claim under Rule 12(b)(6).

**3.**

Defendants' final argument challenges Count V, which purports to state a claim for fraud against Slone and C&S Aircraft.[10] Those companies played decidedly different roles in the alleged fraud, so I will analyze the claims against them separately.

**a.**

I start with the prime contractor, Slone. In Count V, State Construction alleges that Slone (along with Two Rivers) "misrepresented that C&S Aircraft Services, Inc. was a first tier subcontractor to perform the grading and site excavation work on behalf of the prime contractor Slone Associates, Inc.," and that Two Rivers "was C&S's sub-subcontractor to perform certain excavation work and grading work for the Project, including the installation of the underground utility work." Am. Compl. ¶ 79. The Amended Complaint asserts that Defendants "made these statements to entice State to serve as a subcontractor on this Project with the false belief that it did not have any Miller Act rights against U.S. Specialty's Payment Bond and for State to rely solely on the Joint Check Agreement for payment." *Id.* ¶ 82.

As fraud claims go, this one is, admittedly, a shade out of the norm. More typically, a party alleging what effectively amounts to fraud in the inducement seeks relief from contractual terms that turned out to be less advantageous than the party was led to believe they would be at the time of execution. Here, though, as Defendants are quick to note, State Construction entered into its subcontract with Two Rivers without any expectation that it would have the benefit of Miller Act coverage. In other words, State Construction did not get the benefit of the deal it entered into, and

---

[10] The Amended Complaint also asserts this claim against Two Rivers, but as I have already noted, that company did not join Defendants' Consolidated Motion to Dismiss.

it now seeks to recover in fraud on the basis of an assertion that it would have rejected the deal entirely, or might have sought a better one, had it not been misled.

This is not to say, though, that Count V cannot survive a Rule 12(b)(6) motion. The question, at this stage, is whether State Construction has pleaded sufficient facts to state a claim for relief that is "plausible on its face," *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007), bearing in mind the heightened pleading standard that applies to claims of "fraud" under the Federal Rules of Civil Procedure, *see* Fed. R. Civ. P. 9(b). To answer this question, I look to the elements of fraud under Maryland law. As a general matter, these are:

> (1) the defendant made a false representation to the plaintiff, (2) the falsity of the representation was either known to the defendant or the representation was made with reckless indifference to its truth, (3) the misrepresentation was made for the purpose of defrauding the plaintiff, (4) the plaintiff relied on the misrepresentation and had the right to rely on it, and (5) the plaintiff suffered compensable injury as a result of the misrepresentation.

*Hoffman v. Stamper*, 867 A.2d 276, 292 (Md. 2005).

Defendants' contend the Amended Complaint comes up short on several of these elements, beginning with the first. On that front, they argue it was not technically false for Slone to state, as the Amended Complaint alleges, that C&S Aircraft "was a first tier subcontractor to perform the grading and site excavation work" on the project and that Two Rivers "was C&S's sub-subcontractor to perform certain excavation work and grading work." Am. Compl. ¶ 79. Granted, the way these statements are worded in the Amended Complaint leaves unclear whether Slone affirmatively asserted that C&S Aircraft would itself perform the work specified in its subcontract.[11] This, it is now clear, would have been a false statement. But Maryland law

---

[11] State Construction's response in opposition to the Consolidated Motion to Dismiss alleges that Slone and Two Rivers executives told the company in early September 2015 that C&S Aircraft "would be supervising and performing in part the erosion control, earthwork and grading, and

recognizes the possibility that statements that are not literally false may nevertheless be fraudulent. Most relevantly for present purposes, a defendant may be liable for fraud if he "conceals facts that materially qualify affirmative representations." *Lubore v. RPM Assocs., Inc.*, 674 A.2d 547, 556 (Md. Ct. Spec. App. 1996). That appears to be the allegation here, where the Amended Complaint asserts that Slone Vice President William Slone told State Construction that C&S Aircraft "was a first tier contractor to perform" specified work, but did not clarify that C&S would not, in fact, be performing any of that work itself.[12]

Defendants next turn to the third element of fraud: the requirement that the defendant made the misrepresentation for the purpose of defrauding the plaintiff. State Construction, they argue, "has not pleaded any facts to indicate that Slone and C&S entered into a subcontract agreement with the intention of defrauding State or any other party." Mot. to Dismiss 20. Even if this were true, it is beside the point. To plead a claim for fraud, State Construction does not need to trace Slone's purported bad intentions to July 15, 2015, the date on which Slone and C&S Aircraft executed their subcontract. What it must do, rather, is allege that Slone harbored such intentions *at the time of the misrepresentation.* State Construction has done this. Specifically, the Amended Complaint alleges that William Slone made the misrepresentation on September 24, 2015, more than two months after his company executed its subcontract with C&S Aircraft; that he did so with

---

surveying," Opp'n 30, but this assertion is not in the Amended Complaint and cannot be used to defeat the motion, *see Davis v. Cole*, 999 F. Supp. 809, 813 (E.D. Va. 1998).

[12] Generally, of course, a fraudulent misrepresentation must refer to a "past or existing fact." *Fowler v. Benton*, 185 A.2d 344, 349 (Md. 1962). This rule, though, is not without exception. If, for instance, "the defendant possesses special information which enhances the credibility of a statement of opinion or a prediction about future conduct or events, then the statement of prediction can be considered a false representation." Paul Mark Sander & James K. Archibald, Pleading Causes of Action in Maryland § 3.91 (5th ed. 2013) (citing cases). That would seem to be the case here, as State Construction would have every reason to expect Slone, the prime contractor, to be fully aware of the nature of its agreement with C&S Aircraft and of how it was to be performed.

the knowledge that his statement was false; and that he intended to induce State Construction President Joaquim Mendez to sign an agreement that would not include the benefit of Miller Act protection. *See* Am. Compl. ¶ 79.

Defendants also challenge State Construction's contention that the alleged misrepresentation caused it injury. They argue that any damages the company might have sustained "are contractual damages limited to contract remedies against Two Rivers." Mot. to Dismiss 19. To be sure, State Construction is seeking contract damages. There is no reason, though, why it should not have the opportunity to assert an alternative theory of liability. *United States ex rel. Tusco, Inc. v. Clark Constr. Grp., LLC*, 235 F. Supp. 3d 745, 755 (D. Md. 2016). To that end, State Construction has alleged that its executives relied on Slone's misrepresentation in deciding to enter into a contract on suboptimal terms and that, because of those terms, the company has had to fight to recover what it is due. This is a sufficient allegation of injury to overcome Defendants' Rule 12(b)(6) challenge.

Finally, Defendants argue the Amended Complaint does not satisfy the heightened pleading standard for fraud claims. *See* Mot. to Dismiss 21. Rule 9(b) of the Federal Rules of Civil Procedure requires a plaintiff alleging fraud to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). In cases brought under the False Claims Act, the Fourth Circuit has stated that Rule 9(b) requires a plaintiff to, "at a minimum, describe the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *United States ex rel. Nathan v. Takeda Pharm. N. Am., Inc.*, 707 F.3d 451, 455-56 (4th Cir. 2013) (quoting *United States ex rel. Wilson v. Kellogg Brown & Root, Inc. (KBR)*, 525 F.3d 370, 379 (4th Cir. 2008)); *see Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999). "This minimum factual description is

31

'often referred to as the who, what, when, where, and how of the alleged fraud.'" *Topshelf Mgmt.,*

*Inc. v. Campbell-Ewald Co.*, 117 F. Supp. 3d 722, 725 (M.D.N.C. 2015) (quoting *KBR*, 525 F.3d

at 379).

Here, there is no dispute that the Amended Complaint specifies the who, what, and when

of the alleged fraud. It states that William Slone and Two Rivers President Stephen Allen made

fraudulent misrepresentations on September 24, 2015, the day that State Construction entered into

its subcontract with Two Rivers. *See* Am. Compl. ¶¶ 24, 79. Those statements, specifically, were

"that C&S Aircraft Services, Inc. was a first tier subcontractor to perform the grading and site

excavation work on behalf of the prime contractor Slone Associates, Inc. on the Project . . . and

that Two Rivers Site Development, Inc. was C&S's sub-subcontractor to perform certain

excavation work and grading work for the Project, including the installation of the underground

utility work." *Id.* ¶ 79. Defendants note, though, that the Amended Complaint does not state

*where* William Slone and Allen were when they made the misrepresentations. *See* Mot. to Dismiss

21. And, relatedly, I note that it does not specify whether the misrepresentations were made orally

or in writing.

These are oversights, to be sure. As a practical matter, though, I do not view them as fatal.

As the Fourth Circuit has explained, the heightened pleading standard under Rule 9(b) serves

several purposes. Most especially, it seeks to put the defendant on notice of its alleged misconduct

and to prevent plaintiffs from filing "frivolous suits . . . 'in which all the facts are learned after

discovery.'" *Takeda Pharm.*, 707 F.3d at 456 (quoting *Harrison*, 176 F.3d at 784). Here, State

Construction has pleaded its claim with enough particularity to alleviate any concern that its suit

is a mere fishing expedition. Its Amended Complaint alleges that particular individuals made

particular statements on a specified date, while the parties were wrapping up negotiations on State

Construction's subcontract with Two Rivers. State Construction should have no difficulty amending the Amended Complaint to indicate where William Slone and Allen were when they made the alleged misrepresentations and whether they made those misrepresentations orally or in writing. Accordingly, I decline to dismiss the fraud claim against Slone, and I grant State Construction leave to further amend the Amended Complaint for this limited purpose only.

**b.**

The same analysis does not apply to C&S Aircraft. The Amended Complaint does not allege that anyone from C&S Aircraft made false representations on or before September 24, 2015 (or, for that matter, any misleading statements that might have imposed on the company a duty to correct a misimpression). In fact, the Amended Complaint states that the company "was not part" of State Construction's negotiations with Slone and Two Rivers "or any other negotiations State was involved in." Am. Compl. ¶ 18. The response in opposition to the Consolidated Motion to Dismiss further acknowledges that State Construction executives "never met or talked to" Charles Adon Clark, who, along with his wife, was the sole shareholder of C&S Aircraft. Opp'n 31.

State Construction notes that C&S Aircraft was a party to the Joint Check Agreement, which labeled the former a "third tier subcontractor" and the latter the "first tier subcontractor." *See* Opp'n 30-31. But the parties did not execute that agreement until October 16, 2015. *See* Am. Compl. ¶ 81; Opp'n 31. That is nearly a month after State Construction made the allegedly fateful decision to enter into its subcontract with Two Rivers under terms that, as William Slone and Allen had already made clear, would not entitle State Construction to Miller Act protection. *See id.* ¶¶ 24, 79. There is simply no way State Construction could have detrimentally relied on any statements in the Joint Check Agreement in making that decision. Accordingly, the fraud claim

against C&S Aircraft must be dismissed. And as this was the only claim asserted against C&S Aircraft, the Clerk shall dismiss that company as a defendant in this action.

## CONCLUSION

Defendants' Consolidated Motion to Dismiss will be granted in part and denied in part. State Construction may proceed to seek relief under all of the challenged counts. The fraud claim (Count V) survives, but only as to Slone and Two Rivers. In proceeding on this claim, State Construction may amend its Amended Complaint for the limited purpose of indicating where Slone Vice President William Slone and Two Rivers President Stephen Allen were when they made the alleged fraudulent misrepresentation on September 24, 2015, and whether they made the misrepresentation orally or in writing. No other revisions to the Amended Complaint are authorized. The fraud claim against C&S Aircraft is dismissed, as the Amended Complaint fails to allege that that company made any false statements upon which State Construction could have detrimentally relied.

A separate order follows.

Date: April 22, 2019

Paul W. Grimm
United States District Judge